13-3365 JNS Power and Control System v. 350 Green, LLC Good morning, Your Honors. Michael Bernstein You can wait a minute until everyone leaves because Sure Yeah Good morning, Your Honors. Michael Bernstein on behalf of the appellant, 350 Green in this case We here face on an appeal of a district court decision granting the appellee's motion for partial summary judgment and for specific performance It is the argument of appellant that the court committed several instances of reversible error both in finding liability and granting the motion for partial summary judgment And then secondarily in granting the extraordinary relief of specific performance after finding of the liability on the partial summary judgment In order for the court to determine that the asset purchase agreement and the enforceability of the asset purchase agreement by appellee which was the subject of the motion for partial summary judgment The court considered the previously executed exchange agreement which had been executed by the prior members of the appellant and unrelated parties, car charging grouping and 350 Holdings And in that agreement which predated the asset purchase agreement and which was governed by Florida law, 100% of the membership interest in the appellant were being transferred along with all the relevant assets and the disclosed liabilities that were set forth in that agreement in the exchange agreement to car charging and 350 Holdings So you know logically who if anyone could contest your position or whether or not there was a contract between CCGI and 350 Green if JNS were precluded from doing so I mean does it make sense to say that JNS cannot respond to your own contention that the CCGI contract precludes the asset purchase agreement between JNS and 350 Green In response to that your honor I'm going to say that under Florida law which governs the equity exchange agreement and the cases we cited like Sun Commodities versus C.H. Robinson The JNS as a third party and a non-intended third party beneficiary who was not a party to the contract could not themselves argue the interpretation of the exchange agreement What the court found in the district court decision in its footnote it said that JNS was not seeking to enforce a claim under the exchange agreement and therefore the standing argument had no merit And JNS raised the issue of the fact that we had raised it as an affirmative defense in the underlying case and therefore they had the ability to challenge it In answer to your honors question JNS has the ability to bring evidence before the court for example by testimony from the parties to that agreement under Florida law They could have deposed the former members of 350 Green they could have deposed the members of CCGI and 350 Holdings and submitted evidence for the district court to consider whether or not the exchange agreement in accordance with its terms was valid or invalid See I may be really missing something but JNS is not seeking to enforce the contract between CCGI and 350 Green It's CCGI which is relying on its contract as an obstacle to the agreement between 350 Green and JNS so I don't understand why JNS can't respond to CCGI's argument I just don't get it The case specifically says that an entity who is not a party or an intended beneficiary cannot enforce or interpret the contract what we have here is not an enforcement your honor and that's what Judge Bucklow held She held that they're not seeking to enforce it we agree with that they're seeking to interpret it and how do we know that because if you read the decision the judge goes through a several page analysis based on the arguments of JNS That the exchange agreement was terminated unilaterally that there was no issue of material fact that it was terminated and that even if it wasn't unilaterally terminated that under Florida law proper notice and an opportunity to cure were given So let's assume for example that we take away the standing argument that we say based on the fact that it was raised as a defense JNS could argue whether it's enforceable or not they would still have to rely on Florida law in making that argument And Florida law says whether they have standing or not Florida law says that a party cannot unilaterally terminate a contract if there's no time of the essence provision So JNS says well it was unilaterally terminated because there was an offer and a counteroffer and JNS and the district court relied on a first department Florida decision which said which discussed a settlement agreement And there was negotiations under a settlement agreement and the parties did not have a meeting of the minds as to the terms of the settlement and then one party sued to enforce the terms of the alleged agreement and the court said no because there was no meeting of the minds It's not enforceable in this case this was not a settlement agreement this was a pre-existing exchange agreement that was signed it was binding and it had a closing date It was no time of the essence clause in order for JNS to argue even if it could argue that it was not enforceable they would have to show that in accordance with its terms it was terminated Under Florida law and under the express provisions of Florida law the former members of 350 Green did not have the right to terminate it unilaterally they had to give a notice and opportunity to cure Well I'll give you this as you say there was no time is of the essence provision in the contract and without one Florida law appears to frown on strict enforcement of deadlines Perhaps there is a distinction to be made between delays in forming a contract and delays in performing on a contract once formed The cases that were cited your honor in the brief show that Florida law is very clear and in both instances these were purchase agreements that did not have time of the essence clauses And for example in Westcorp government securities versus Homestead Air Force Base the 11th circuit citing Florida law clearly held that the buyer was not able to unilaterally terminate the agreement In that case I believe it was eight there were two cases cited one was an eight day delay in providing closing documents and signatures and one was a six day delay And the court said that that was insufficient the fact that they didn't turn over the closing documents in that case there was an argument about the deposit and whether or not they complied with certain provisions And the Florida court was clear if there's no time of the essence provision Florida law requires number one a delay is not grounds for termination and number two you need a notice with an opportunity to cure Of course Judge Bucklow thought that once CCGI injected that new term into the deal it was really initiating negotiations on a new and different contract But that we believe that the court overstepped its bounds because there's no Florida case that was cited by the court on which it had to rely that cites that premise There's no premise under Florida law that if I have a contract to buy a property or a good a car or whatever it might be and the day or two before closing I come in and I try to negotiate a point And I say to you well you know the roof is not in the proper condition or I think there's a scratch on the car I'd like to get a discount does that automatically invalidate every contract When someone comes over and says I want to modify a term of the agreement the other side has the opportunity to say okay or like Florida law says in the cases we cited when there's no time of the essence clause You say after the closing date passes and the other side does not perform you have to send a notice you must perform you are in breach if you don't perform by this date certain this contract will be deemed terminated And the court Judge Bucklow expressly relied on the affidavit submitted by JNS by attorney John Pierce in the New York Southern District action where on March 21st the day before the closing He allegedly makes a phone call to the council for car charging and says if you don't close tomorrow we're going to deem the contract in default Now the court expressly relies on that and says well there was no opposition to that we argue that there was documents and e-mails showing that that affidavit in and of itself was contradicted by the e-mails of Mr. Pierce Who said that what your honor just brought up the issue of this non-compete we'll consider it but I have to meet with my clients on March 25th because they're out of the country and we'll get back to you And before he even responds on whether or not they would consider that issue relating to non-compete CCGI turns in the signature pages to close under the exchange agreement on March 26th And Florida law in the case we cited that there's no counter to it on Fowler v. Gardner says that the date for payment ran until midnight June 1st 2011 The soonest a notice of default could be issued was 12 or 1 a.m. on June 2nd thus the notice given at 4.51 p.m. on June 1st was premature and the five day notice period did not commence In this case the only notice alleged notice that Judge Bucklow relies on that JNS argues was given occurred a day before the closing and under Florida law that was not noticed when an opportunity to cure And the judge goes through the analysis saying they had one day to close and that they should have closed but that completely goes contradictory to applicable Florida law in point The question here is was there an issue of fact and there was. There was an issue of fact in whether the assets that were part of the exchange agreement which were being sold along with 100% of the member interests were transferred pursuant to that exchange agreement And the asset purchase agreement which expressly says in its terms and which is cited in the brief that there is no legal impediment to the 350 Green and its members making this and signing this agreement And they have the legal authority to do so. Well there's an issue of fact of whether or not they had the legal authority to do so whether those same very assets had already been sold pursuant to the exchange agreement And the court completely disregarded that in its decision making process and secondarily the issue comes up as to whether or not the court erred in once it went through this whole analysis under Florida law and misapplied applicable Florida law both on the ability to unilaterally terminate On whether or not there was a notice with an opportunity to cure and whether or not there was an issue of fact as to whether or not the actual terms of the asset purchase agreement were enforceable the question then becomes should they have given the extraordinary remedy of specific performance and that the argument that we make is that in this case these are monetary damages Well it seems to me this arrangement with Chicago is pretty unique and hard to compensate really when you've got I know there were what 59 or so stations that had not yet been put in place but that arrangement with Chicago seemed to be very unusual and hard to measure in damages Well I don't think it was hard to measure damages because at the end of the day that was attached to a grant and that's what they had argued however one of the reasons in the original exchange agreement and the consideration that was used and the method by which the amount of the payment under the exchange agreement was determined was based on assets and liabilities of 350 green including some of these Chicago assets and its liabilities And some of those liabilities your honor were based on the fact that a lot of that grant money was squandered most of it was there was none left and that's why the FBI had raided them and there were all those related issues which were based on that valuation and that's exactly why whatever amount of the grant was left and whatever amount of money was needed to pay off the liens and whatever income could come out of those Chicago charging stations were still a quantifiable amount You can calculate how much money you could have made from them how much money you would need to pay off those liens how much money that those locations were worth it's not as if it's a house that's only in one particular location and could never be duplicated There are charging sites all over Chicago there are others even some of those contracts contain multiple sites so the fact that it was attached to a specific grant doesn't make it unique because you can still quantify the damages that could arise if there was an ultimate finding of breach under that contract. Thank you.  Good morning may it please the court for the record Patrick Dede on behalf of the appellee in this case Janice Power and Control. Let me first address the standing issue that Mr. Bernstein has raised again it was addressed in the footnote we think correctly for several different reasons and let me just talk about those. First of all just to give you the specific sequence of events on April 17th is the day of the AP April 17 2013 the asset purchase agreement is signed by 350 green and JNS. On April 30th JNS gets the only approval it needs from the city of Chicago that they're going to accept them to be the assignee for the grant and then on May 6th of 2013 JNS makes a demand on 350 green to perform pursuant to the asset purchase agreement. There's an exhibit in the record it's in exhibit 5 of JNS 56.1 statement which is a three page letter from Mr. Bernstein in which to the attorneys for 350 green in fact one of my partners who says basically lays out all of the different defenses that they have with respect to the enforcement of the asset purchase agreement by JNS. Not in the CCGI case but in the JNS case the affirmative defenses that were raised specifically put at issue as Judge Bucklow indicated the equity exchange agreement. Affirmative defense number two talks about the fact that JNS should be barred on the doctrine of unclean hands because it knew about the equity exchange agreement. It says that the asset purchase agreement is void as a matter of law because of the exchange agreement. That's defense number four and also that it claims that 350 green had no legal capacity to enter into the APA which is a defense number six. And if you look at what the real issue that Judge Bucklow addressed was she recognized I think initially putting aside the entire question of whether or not the contract when it was still in force she looked at the contract from that is the equity exchange agreement from March 8th when it was signed until the date that April 22nd when it closed. And there's no dispute in this case that on April 22nd the actual which is five days after the asset purchase the agreement whether it was new or the same is a matter of issue. But the agreement between 350 green and CCGI that is card charging Inc. did not close until April 22nd after the New York lawsuit. So the first matter, the threshold matter that Judge Bucklow addressed in her decision was looking at the exchange agreement on its face because it's an unambiguous agreement. Both parties agreed it was unambiguous. That's why we had expedited discovery without any depositions. And she determined that on the terms and specific provisions of that agreement if it was in effect on April 17th or any other time up until the time of April 22nd when the actual membership interest transferred and the 350 green officers were required to relinquish and resign from their positions whether or not did 350 green have the legal authority to transfer the assets that were involved in the Chicago project. And she said unequivocally that the and I think it's clear from the express provisions of the equity exchange agreement that nothing in that agreement provides for anything similar to what 350 green claims should have been the case. That is somehow 350 green was limited in their ability to transfer the assets. There's no specific provision that says during the pendency of this case, after execution and prior to closing, 350 green can't sell the assets. It doesn't say they can't sell their membership interest. Now, there are clearly provisions in the agreement that would permit CCGI to find them in breach, could have found that decide not to go forward with the closing and transfer the shares because they had changed materially the operation and the assets of 350 green. But there's nothing in the express provisions of the contract that is the equity exchange agreement that prohibited 350 green from actually engaging in the conduct that they did. They could have done it on March 2nd, March 10th, March 17th, but they did it on April 17th. They entered into this agreement with JNS in which they transferred a portion of their assets, which they were entitled to do at that time because, again, 350 green argued in the district court that there were express provisions in the equity change agreement prohibiting the sale or transfer of assets. They've abandoned that argument here. They're trying to say now that somehow the court should glean from either the statements of the CEO of CCGI and now the CEO of 350 green that it was the intention of the parties that the assets be included or there were some reference to the Chicago assets in some of the schedules. But what Judge Bucklow addresses that point saying that even if there's some indication in the schedules that it was contemplated between the parties that the assets of the Chicago operation, and 350 green was operating businesses in a similar type of situation. They were installing these networks of car charging stations in Pennsylvania, in Ohio, Indiana, and also had a grant here in Chicago to install these 219 car charging stations. So what Judge Bucklow determined on page 9 and 11 of her opinion was that there is no express provision that prohibits 350 green from transferring these assets. And that was the basis of her preliminary determination. She reached the other issues, but if you look at her decision, she said whether or not the contract terminated on March 22nd or it was somehow still alive on April 17th is really of no matter. Because what I find based on the unambiguous language of the equity change agreement is that there's nothing prohibiting 350 green from transferring these assets. Again, nobody's saying that they couldn't have done that. In fact, 350 green refers to several occasions prior to the March 8th equity change agreement where there was some limitation. And that's true. If you look at the August term sheet and you look at the July term sheet in 2012 that were between CCGI and 350 green, there was an exclusivity provision in both of those agreements that provided for, it didn't say anything about the assets of 350 green, but it said that 350 green during the pendency of the due diligence would not sell the company. Now, they didn't have that same provision in the equity exchange agreement. There's nothing in the equity exchange agreement that says that during the 10 business days between execution and closing, you can't sell the company or you can't sell the assets. They could have had that, but it's not there. And that's what Judge Bucklow said. You can talk all you want about whether or not Schedule 2.6 or Schedule 2.5 or Schedule 2.9, talk about the Chicago assets, it doesn't matter. Because what she says, her words are the substantive provisions of the equity exchange agreement do not prohibit the sale of the assets in this case. There's nothing in this agreement that does so. I really want to talk about Florida law. Judge, let me just say Florida law, I think, is relevant here. And I think that to the extent that it is, first of all, I think with respect to the standing issue and whether or not J&S could challenge that. If you look at all the cases that 350 green cites, they're talking about a third party not trying to enforce that agreement. And I beg to differ with Mr. Bernstein's characterization of those cases. It doesn't talk about enforce or interpret. It talks about I want to get the benefit of this agreement that I'm not a party to. And the court says, like many courts say, I think Illinois has the same provision, that you can't enforce a contract you're not a party to or a third party beneficiary of. The question that I think that he tries to suggest in the decisions talking about this time of the essence is somehow under Florida law, there is no anything that would permit the, in this case, 350 green to basically say on March 22nd, you didn't comply with the agreement. You provided this counteroffer, therefore, we're not required to close. We're not required to do anything with respect to that. And we cited two cases from Florida on that issue in our brief. They're on page 25 of our brief. And they are the case of Ripken v. Evergreen Sales and also Nichols v. Hartford Insurance. Both of those cases talk about the concept that is discussed by Judge Bucklow in her decision, which is it isn't just a simple question of a few minutes, a few days delay. What we're talking about here is a material change in the agreement after, in this case, 350 green had fully complied with the contract. And I think that if you look at, there's a subsequent email on the 8th of April by Mr. Pierce. I think it's exhibit number, let me see if I have it here, where he's talking about the exact same issue as to why it's not enforceable. Mr. Pierce says, I think on, it's exhibit 10 on our 56.1 statement. It's a series of emails between Mr. Pierce and CCGI's in-house counsel. Basically, it was on April 8th, a few days before the lawsuit was filed in New York on April 10th. It was 350 green's position that what happened leading up to March 22nd was a counteroffer or an anticipatory breach of the contract that here under Florida law, in the Nichols case, says it basically extinguishes the prior offer. You're not required to go forward, not required to comply with the terms of the agreement. And Nichols was a case where, very similarly, the case had been settled, had been resolved. The parties had agreed to a particular term. The defendants in this case were paying off a plaintiff's claim, sent a check with a notification provision that was unacceptable and not been negotiated. It was rejected by the plaintiff's counsel. And in that case, they tried to, again, resend the check without the notification provision. And the court in Nichols says the plaintiff in that case was not required to accept the terms that, even though they had been previously agreed to by the parties, because there had been an intervening counteroffer that negated the offer. So in that case, Nichols' case, I think, is directly on point with the situation presented here. And let me just go through the facts. I think that Mr. Bernstein has played a little fast and loose with respect to what the actual sequence of events was, and I think that's important for looking at the entire issue with respect to the Florida law. On Thursday, March 21st, as Mr. Pierce says in his affidavit, he submitted the closing documents to CCGI's in-house counsel, Ms. Kylie Wagonett. And that happened at 837 a.m. I believe that's Eastern Standard Time, but I can't always be sure. And then later that morning, Ms. Wagonett responded in an e-mail saying, I received your documents, but I'm not yet authorized to close. I'm not authorized to send the signature pages. In fact, we have not closed. In response to that afternoon, Mr. Pierce calls back and speaks with her. It's reflected in his affidavit, and it's not disputed that they had a conversation. He said that he told her that under no certain terms, we don't close by the close of business on the 22nd. We're going to consider the deal over. Now, putting aside what Florida law says, what happened the next morning was or actually not the next morning, the next afternoon, Ms. Wagonett sent to 350 Green's members copies with Mr. Pierce, an e-mail that says we're attaching a six-month non-compete agreement and an addendum extending the closing date from March 22nd to the following Monday, which is March 25th. And she says in her e-mail, which is quoted by Judge Bucklow, we need both documents signed and returned before I will circulate the CEO's signature pages. So that's what she says at 225 p.m. on Friday. The 5 o'clock deadline comes and goes. There's no response from CCGI. Mr. Pierce, in his affidavit, said he got a copy of that particular document. He considered them to be either anti-story breach or on a counteroffer. He does communicate on the 23rd on Saturday to Ms. Wagonett and says a decision regarding the disposition of this matter will occur after my clients have returned after closing business on Monday the 25th. He doesn't say that he's agreed to it or there are further discussions. But on the 25th, both the members of 350 Green return, and they communicate both to J&S. That is, Mr. Tim Mason has an e-mail that's reflected in Exhibit 11 of our 56.1 statement, which he says at 826 p.m. on Monday, we're back. We consider the case, the matter terminated. Our attorney has already been in touch with CCGI, and they're putting together a new deal. And they've been in touch with the city about whether or not J&S would be a viable candidate to take over the grant. So this is a communication from Mr. Mason to our client, Mr. Howell, who is the president of J&S. Later that evening, the other member, Mariana Yerzanich, she communicates to one of her agents that is the Oracle representative that the deal is off and we're going to look elsewhere. The following morning at 855 a.m., there's an e-mail that's actually Exhibit J in the brief or excuse me, the 56.1 statement of 350 Green in which that agent, whose name is Craig Sultan, he sends an e-mail to Ms. Wagonet saying here's the deal. They're not they've terminated the contract. They are not interested in going forward. They don't trust CCGI. And here's a copy of Ms. Grenech's e-mail that's attached. So if you go through the e-mail chain, you can see that before 9 o'clock in the morning on Tuesday, that CCGI knew that 330 Green had rejected the offer. They had rejected the counteroffer, that is the non-compete, and they had not agreed to the extension. Later that morning, they do send a proposal. I have to ask you to wrap up. All right. I mean, if you have a last thought. If there are any other questions, we think that based on all that, it's clear that Judge Bucklow found that those were all new negotiations. Everything that happened after the 22nd were all new negotiations between the parties, and we think that's actually reflected in the exhibits that were attached in the appendix by 330 Green in this case. You look at those e-mails, and it's not about resurrecting somehow the old agreement. They're talking about a new agreement altogether, and we think based on that that the court should affirm the decision of Judge Bucklow. Thank you very much, Mr. D. How much time does ñ well, I'm going to give you an extra three minutes. Just very, very brief in response. Again, at the end of the day, there's an issue of fact, whether or not there was an impediment to the asset purchase agreement being enforceable. Mr. Dede discusses about the fact that the parties agreed that the exchange agreement was unambiguous, and the court cites that in its decision. However, the exchange agreement in accordance with its terms, if the parties are trying to interpret the exchange agreement, is unambiguous. However, in this case, what the court overstepped its bounds of what J&S is arguing is that the exchange agreement is unambiguous as it relates to the unrelated asset purchase agreement, and in that case, there is an ambiguity. The question is which assets were included in the exchange agreement when it was negotiated, and that's why Mr. Farkas gave his affidavit because most of the time when it's a summary judgment issue, you have competing affidavits from people with knowledge who state facts which contradict each other, and the court says, I need testimonial evidence to determine whether or not there's an issue of fact, and in this case, you have a company that's paying for 100% of the member interests and the related assets, several of which are included in the attached schedules, which were the Chicago assets as well, and the question is, was their valuation paid for these assets that were then transferred under this asset purchase agreement? And contrary to what Mr. Dede is saying, we believe that there is an issue of fact the court should have considered, and we believe that there's nothing on the Florida case law cited by J&S or correctly by the court that this is some new agreement. If you follow the court's logic, that would mean that any time that there's a breach or someone makes an allegation in a contract, that would automatically nullify the contract. As Mr. Dede argued, he said that in the case he cited, that there was an offer and then an intervening counteroffer. There's no intervening counteroffer here. There was an exchange agreement that was signed and binding. The question then becomes, did it close on time? No. Was there a notice with an opportunity to cure under Florida law? No. So the question is, was that agreement binding, and did the terms of that agreement preclude the APA from being validly executed and enforced? And our opinion is that the lower court decision should be reversed, finding that there are issues of fact as to whether or not the exchange agreement was terminated and whether or not the 350 Green had the ability to enter into this other agreement with the J&S. And then lastly, we still believe, as I stated earlier to Your Honor, that there's an issue as to whether or not specific performance should have been granted because there are quantifiable damages here no matter how you slice it. You can calculate an amount of damages and grant it in the event of a breach. Thank you very much. Thank you. Thank you, everyone, and the case will be taken under advisement.